**Opinion filed February 28, 2013**



In The

# Eleventh Court of Appeals

_____

## No. 11-11-00073-CR
_____

### ROGELIO ESQUIVEL RODRIGUEZ, Appellant
### V.
### STATE OF TEXAS, Appellee

**On Appeal from the 132nd District Court**
**Scurry County, Texas**
**Trial Court Cause No. 9683**

## M E M O R A N D U M   O P I N I O N

The jury convicted Rogelio Esquivel Rodriguez of four counts of aggravated sexual assault of a child. The jury assessed Appellant's punishment at confinement for a term of ninety-nine years and a fine of $10,000 for each offense. The trial court sentenced Appellant accordingly and ordered that the sentence for Count II run consecutively to the sentence for Count I and that the sentences for Counts III and IV run concurrently with the sentence for Count I. We affirm.

### *The Charged Offenses*

A person commits the offense of aggravated sexual assault if he intentionally or knowingly "causes the penetration of the anus or sexual organ of a child by any means" or "causes the penetration of the mouth of a child by the sexual organ of the actor" and if "the

victim is younger than 14 years of age." Tex. Penal Code Ann. § 22.021(a)(1)(B)(i), (ii), (a)(2)(B) (West Supp. 2012). Counts I, III, and IV of the indictment alleged that Appellant penetrated the sexual organ of J.R. with his sexual organ on or about May 7, 2005 (Count I), on or about April 17, 2010 (Count III), and on or about April 21, 2010 (Count IV). Count II alleged that Appellant penetrated J.R.'s mouth with his sexual organ on or about June 12, 2008.

### Issue on Appeal

In his sole issue on appeal, Appellant challenges the legal sufficiency of the evidence to support his convictions.

### Standard of Review

We review the sufficiency of the evidence under the standard of review set forth in *Jackson v. Virginia*, 443 U.S. 307 (1979). *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010); *Polk v. State*, 337 S.W.3d 286, 288–89 (Tex. App.—Eastland 2010, pet. ref'd). Under this standard, we examine all of the evidence in the light most favorable to the verdict and determine whether, based on that evidence and any reasonable inferences from it, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010). In conducting a sufficiency review, we are required to defer to the jury's credibility and weight determinations because the jury is the sole judge of the witnesses' credibility and the weight to be given their testimony. *Merritt v. State*, 368 S.W.3d 516, 525 (Tex. Crim. App. 2012); *Brooks*, 323 S.W.3d at 899.

### The Evidence at Trial

Appellant is J.R.'s father. R.R. is J.R.'s mother. At the time of trial, J.R. was thirteen years old. Appellant and R.R. were never married. Appellant had visitation rights to J.R. under a 2001 court order.

J.R. lived with R.R. and J.R.'s younger sister and younger brother in Snyder. J.R.'s younger sister and younger brother are not Appellant's children. When Appellant first started visiting J.R., he lived in Waxahachie. At that time, Appellant had supervised visits with J.R. Later, he had unsupervised visits with her.

J.R. testified that Appellant sexually abused her for about four or five years. She said that the first incident of abuse occurred at the Willow Park Inn in Snyder when she was seven or eight years old. J.R. said that she and Appellant swam in the pool at the Willow Park Inn and

then went into a room there. J.R. said that Appellant told her to sit by him on the bed and to watch television. At that time, J.R. was wearing the shorts and shirt that she had worn in the pool. Appellant got up, turned off the lights, and then lay down in the bed. Appellant told J.R. to lie down beside him. J.R. testified that "stuff started happening." She said that Appellant touched her bottom. She also said that Appellant took off her shorts and panties and took off his underwear. She saw Appellant's penis. J.R. testified that Appellant got on top of her. Appellant's stomach was touching her stomach. J.R. said that Appellant put his penis into her vagina. She said that Appellant's penis was hard and that it hurt her. She told Appellant to stop, but he did not. J.R. did not know whether Appellant ejaculated or used a condom on this occasion. After Appellant finished what he was doing, he told J.R. to go to the bathroom.

J.R. testified that Appellant told her not to tell anyone what had happened. Appellant also told her that, if she told someone, R.R. would go to jail; J.R.'s brother and sister would be taken away from R.R.; and J.R., her brother, and her sister would be separated from each other. Based on these threats by Appellant, J.R. was scared to tell anyone what had happened to her.

J.R. testified that Appellant had sex with her "a lot of times" over a four- or five-year period of time. She said that Appellant had sex with her two or three times at the Willow Park Inn and that he had sex with her at his house in Waxahachie, at her grandmother's house in Coleman, at R.R.'s house in Snyder, at another motel in Snyder, at apartments in Snyder that Appellant lived in after he moved to Snyder from Waxahachie, and at a trailer in Snyder where Appellant lived. J.R. testified that Appellant sometimes ejaculated inside her vagina and that he sometimes used a condom. J.R. also testified that Appellant put his penis in her mouth on more than one occasion in Scurry County. At times, Appellant renewed his threat to J.R. that, if she told anyone about what he had done to her, R.R. would go to jail and the family would be separated from each other.

J.R. said that the last incident in which Appellant sexually abused her occurred in April 2010 at Appellant's apartment in Snyder. J.R. testified that, on that occasion, Appellant did not use a condom and ejaculated inside her vagina. J.R. had learned in health class at school how women become pregnant, and she was scared that she would get pregnant. She told Appellant about her concern. According to J.R., Appellant told her that, if she got pregnant, R.R. would kick her out of R.R.'s house, and she would have to live with him.

3

J.R. testified that nobody other than Appellant ever touched her inappropriately. During the time period in which Appellant sexually abused J.R., he asked her many times whether anyone else had touched her. J.R. said that, on one occasion, she was riding with Appellant in his car. They were on their way to Snyder from a visit at J.R.'s grandmother's house in Coleman. Appellant drove the car onto a dirt road. J.R. testified that Appellant kept asking her whether anyone had touched her and that she kept telling him, "No." She said that Appellant stopped the car, got out, made her get out of the car, and then drove off. Appellant came back and then put J.R. back into the car. J.R. again told Appellant that nobody had touched her. Appellant wrote some names on a piece of paper and told J.R. to say "yes" or "no" as to whether the people named on the paper had touched her. J.R. said that Appellant threatened to leave her on the dirt road if she did not tell him that someone had touched her. The last name on the paper was F.R., who was R.R.'s father and J.R.'s grandfather. Initially, J.R. told Appellant that F.R. had not done anything to her. However, Appellant again asked her what F.R. had done to her. J.R. was afraid that Appellant would leave her on the dirt road if she did not tell him that F.R. had touched her. Therefore, even though F.R. had not done anything to her, J.R. told Appellant that F.R. had sexually abused her.

J.R. testified that, after she told Appellant that F.R. had touched her, Appellant returned her to R.R.'s house in Snyder. At that time, Appellant did not tell R.R. about J.R.'s allegations against F.R., and Appellant did not tell J.R. to tell R.R. about the allegations. J.R said that, at that time, she did not tell R.R. about the allegations because F.R. had not done anything to her.

The record shows that the incident on the dirt road occurred in August 2008. In December 2008, Appellant went to R.R.'s house. R.R. testified that, at that time, Appellant was accusing F.R. of sexually abusing J.R. R.R. said that Appellant wanted her to terminate her parental rights to J.R. R.R. questioned J.R., and J.R. told her that F.R. had touched her. R.R. testified that, although she had no reason to suspect that F.R. had touched J.R., she believed J.R.'s allegations against F.R. because F.R. had molested her when she was a child.

Appellant called the police to report J.R.'s allegations against F.R. Snyder Police Officer Randy Ford responded to the call. Officer Ford testified that Appellant believed that J.R. had been the victim of a sexual assault. Officer Ford took statements from R.R. and Appellant. R.R. told him that she and her sister had been victims of sexual assault by F.R. and that, therefore, she believed J.R.'s allegations against F.R.

4

Appellant told Officer Ford that J.R. made the outcry about F.R. to him in August 2008. Appellant also told Officer Ford the circumstances under which J.R. made the allegations against F.R. The circumstances described by Appellant were consistent with J.R.'s testimony about the incident on the dirt road. Appellant told Officer Ford that he obtained the outcry statement from J.R. by continually confronting her, telling her to get out of the car, and threatening to leave her on the road. Officer Ford believed that Appellant obtained the statement from J.R. by coercion. Officer Ford found it extremely unusual that, although J.R. made the outcry to Appellant in August 2008, Appellant did not tell R.R. about the allegations or report the allegations to the police until four months later. Officer Ford said that the case was turned over to detectives.

Snyder Police Sergeant Keith Ward took a statement from J.R. about her allegations against F.R. Sergeant Ward testified that J.R. told him about the incident on the dirt road. Based on information that the police received during the investigation, Sergeant Ward concluded that J.R.'s allegations against F.R. were completely unfounded. A number of facts contributed to this conclusion. For example, Appellant failed to tell R.R. about the allegations when J.R. made them. Additionally, Appellant delayed reporting the allegations to the police for four months. Also, Sergeant Ward believed that Appellant coerced J.R. into making the allegations by threatening to leave her on the dirt road.

J.R. said that she told the police that F.R. had touched her. She said that the police told her not to get anywhere near F.R. R.R. testified that F.R. had not been in Snyder since 2008.

On April 27, 2010, R.R. and J.R. had a discussion about whether anyone was sexually abusing J.R. R.R. testified that, at that time, Appellant was accusing R.R.'s boyfriend, P.M., as well as some of her family members, of inappropriately touching J.R. R.R. said that J.R. told her that Appellant had touched her. R.R. testified that J.R. was crying and that she said, "It's my dad. It's my dad. It's not [P.M.]. It's my dad that's been doing this to me." J.R. testified that she told R.R. about Appellant touching her because Appellant had "started to blame it on [P.M.]."

R.R. testified that, as soon as J.R. told her that Appellant had been touching her, she told J.R. not to say anything else about it. R.R. told J.R. that they were going to go to the police station. R.R. said that, based on training that she had received at her job, she knew that she needed to let professionals question J.R. about what Appellant had done to her.

5

R.R. took J.R. to the police station. They arrived at the station on April 27, 2010, at about 9:15 p.m. Snyder Police Officer Beatrice Lopez took a report from them. Officer Lopez testified that J.R. was upset at the time. R.R. and J.R. told Officer Lopez that Appellant had sexually abused J.R. Officer Lopez told R.R. and J.R. to come back to the police station the next day to talk to Sergeant Ward.

R.R. and J.R. went back to the police station the next day and saw Sergeant Ward. He arranged for J.R. to give an interview at the Children's Advocacy Center and to have a sexual assault examination. Sergeant Ward testified that Appellant told him that R.R.'s boyfriend, P.M., should be a suspect in the case. Sergeant Ward said that the police conducted an investigation of P.M., that there was no evidence that P.M. had perpetrated any crimes against J.R., and that P.M. was cleared as a suspect. Sergeant Ward also said that Appellant did not mention F.R. as a possible suspect in the case.

Theresa Zarate conducted a forensic interview of J.R. on April 28, 2010. Later that day, J.R. was taken to the Scenic Mountain Medical Center for a sexual assault examination. Lois Kennedy, a sexual assault nurse examiner, performed the examination. J.R. told her that Appellant had been sexually assaulting her since she was seven or eight years old and that the last incident of abuse occurred on April 21, 2010. J.R. also told Kennedy, among other things, that Appellant "put his penis on [her] private"; that Appellant made her "sit on his private"; that Appellant ejaculated; that, occasionally, Appellant used a condom; and that Appellant made her "suck on [his private]."

Kennedy testified in detail about her physical examination of J.R. Kennedy said that, usually, a young female's vagina is "really closed and very plush." She said that, however, J.R.'s vagina was "very open," had no tone, was very thin, and was in a condition "like you would find in a grown adult [who] was sexually active." Kennedy had not seen this condition in any other twelve-year-old girls. She testified that her examination findings indicated that there had been sexual activity consistent with what J.R. had described to her. Based on the examination, Kennedy believed that J.R. had engaged in sex on a repeated and ongoing basis.

Robert Brett Rowlett testified that he was a licensed professional counselor. He said that he had been counseling J.R. since May 2010. J.R. told Rowlett that Appellant sexually assaulted her on multiple occasions over a period of several years. J.R. also told Rowlett that Appellant had sexual intercourse with her.

6

*Analysis*

Appellant states in his brief that "[a]ll evidence offered by the State was based on the statements and testimony of the alleged victim, J.R." Appellant contends that J.R. was not a credible witness because she had previously lied about F.R. sexually abusing her. Based on the contention that J.R.'s testimony lacked credibility, Appellant argues that the evidence was legally insufficient to support his conviction on all four counts.

As summarized above, J.R. provided detailed testimony that Appellant committed the acts alleged in the indictment. The testimony of a child victim alone is sufficient to support a conviction for aggravated sexual assault of a child. TEX. CODE CRIM. PROC. ANN. art. 38.07 (West Supp. 2012); *Chapman v. State*, 349 S.W.3d 241, 245 (Tex. App.—Eastland 2011, pet. ref'd); *Tear v. State*, 74 S.W.3d 555, 560 (Tex. App.—Dallas 2002, pet. ref'd). Thus, J.R.'s testimony was sufficient to support Appellant's convictions. As the sole judge of the credibility of the witnesses, the jury was free to believe J.R.'s testimony that Appellant sexually assaulted her. *Sharp v. State*, 707 S.W.2d 611, 614 (Tex. Crim. App. 1986); *Polk*, 337 S.W.3d at 289. Appellant essentially asks us to conclude that J.R. was not credible even though the jury found her credible. An appellate court, however, may not reevaluate the weight and credibility of the record evidence and thereby substitute its judgment for that of the jury. *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). Additionally, Kennedy's examination findings strongly supported J.R.'s testimony that she had been sexually assaulted on numerous occasions over a lengthy period of time. Viewing all the evidence in the light most favorable to the verdict, we conclude that a rational trier of fact could have found all the elements of the offenses beyond a reasonable doubt. Therefore, the evidence is sufficient to support Appellant's convictions for the offenses of aggravated sexual assault of a child. Appellant's issue on appeal is overruled.

*This Court's Ruling*

The judgment of the trial court is affirmed.

TERRY McCALL

JUSTICE

February 28, 2013

Do not publish. *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Wright, C.J.,
McCall, J., and Willson, J.

7